## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOR T. FREY,<br><br>                                Petitioner,<br><br>          v.<br><br>AEISHA FISHER,<br><br>                                Respondent. | Civil Action No. 22-3501 (ZNQ)<br><br>OPINION |

**QURAISHI, District Judge**

Before the Court is the Amended Petition for a Writ of Habeas Corpus of Petitioner Thor T. Frey ("Petitioner"), brought pursuant to 28 U.S.C. § 2254.  (Habeas Pet., ECF No. 3.)   For the reasons set forth below, Petitioner's habeas petition is denied, and Petitioner is denied a certificate of appealability.

## I.      BACKGROUND

Petitioner was charged in an indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(3); second-degree robbery, N.J.S.A. 2C:15-1(a)(1); third-degree burglary, N.J.S.A. 2C:18-2; and fourth-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1) and found guilty on all charges after a jury trial.  Petitioner appealed.  The New Jersey Superior Court Appellate Division affirmed the trial court's denial of Petitioner's motion to suppress his statements to police, but reversed Petitioner's conviction because the trial court failed to instruct the jury on included lesser offenses. *See State v. Frey,* A-1716-09 (N.J. Super. Ct. App. Div. Aug. 15, 2011).  The New Jersey Supreme Court denied certification.  *State v. Frey*, 209 N.J. 232, 36 A.3d 1064 (2012).

At Petitioner's second trial, the jury found defendant guilty of felony murder, N.J.S.A. 2C:11-3(a)(3); second-degree robbery, N.J.S.A. 2C:15-1(a)(1); second-degree burglary, N.J.S.A.

2C:18-2, and fourth-degree criminal mischief, <u>N.J.S.A.</u> 2C:17-3(a)(1).  *State v. Frey*, WL 1589932, at 1–4 (N.J. Super. Ct. App. Div. Apr. 21, 2016).  Prior to sentencing, the court denied defendant's motions for a new trial based on newly discovered evidence and for a judgment of acquittal or a new trial.  (*Id.* at 8.)[1]  Petitioner received a forty-year sentence for the murder conviction, subject to an eighty-five percent parole ineligibility period and a five-year term of parole supervision after release from incarceration under the No Early Release Act (NERA), <u>N.J.S.A.</u> 2:C43-7.2.  (*Id.*)  Petitioner was also sentenced to concurrent custodial terms of ten-years on the robbery conviction, five-years on the burglary conviction, and eighteen-months on the criminal mischief conviction.  (*Id.*)  The court also imposed restitution and standard fines, fees, and assessments.  (*Id.*)

On February 9, 2016, Petitioner appealed from the judgment of conviction on all counts.  (*Id.*) The following excerpt is taken from the Opinion of the Superior Court of New Jersey – Appellate Division (the "Appellate Division"):

> On the morning of August 18, 2006, the body of seventy-five year old Mary Bostian was found in a bedroom of her home in Phillipsburg, New Jersey. Her hands and feet were bound with cords. An autopsy subsequently revealed that she suffered blunt force trauma to many parts of her body, bruising on her hands consistent with defensive injuries, and several displaced fractures. The Warren County Medical Examiner determined that the cause of Bostian's death was asphyxia, or suffocation, and the manner of death was homicide.
>
> The investigation revealed that Bostian's bedroom had been ransacked, and a sledgehammer was located in the hallway outside of her bedroom. The police found tools, Bostian's purse, and a metal medallion on the floor in the living room.
>
> Bostian's son, John Counterman, kept a 146-pound fireproof safe in the closet of a spare bedroom in Bostian's house. The safe had been framed into the back corner of a closet, and contained a handgun, receipts from Counterman's business, and $25,000 in bills, coins,

---

[1] For pin cites to ECF Nos. 3 and 34, the Court relies on pagination automatically generated by the CM/ECF.

and commemorative quarters. When the police responded to Bostian's home on August 18, 2006, the safe was missing.

A detective made a sketch of the medallion found on the floor of the living room and showed it to Counterman and Naomi Frey, Counterman's girlfriend and defendant's estranged wife. She recognized the medallion and said she had purchased identical "Thor's Hammer" medallions from a mail order catalogue. She had given one to Counterman, which he showed the police was located in his car. Frey gave another medallion to defendant's sister to give to defendant, and Frey had received a card from defendant thanking her for the medallion. A photograph of defendant taken three weeks before Bostian's murder, which showed defendant wearing the Thor's Hammer medallion, was admitted into evidence at trial.

Based upon the information supplied by Frey, the police attempted to locate defendant and learned he was living in Pennsylvania with his fiancé, Robin O'Grady. Robinwas the ex-wife of Donald O'Grady (O'Grady), with whom defendant worked at a construction site in Pennsylvania.

Robin testified that on August 17, 2006, defendant went to work in the morning, and she baked a cake for him because it was his birthday, but he did not return home until early the following morning. Defendant gave Roin $800 and told her he had "robbed somebody." She recalled that defendant became upset after watching a news report regarding a murder that occurred in Phillipsburg, and that defendant said he "robbed that house" with O'Grady but "did not hurt that lady." Defendant told Robin that the house belonged to his estranged wife's boyfriend's mother and that he had taken a safe while O'Grady "was with the lady" in the house.

According to Robin, she told defendant to leave her home, but he returned a few days later with O'Grady, and they had "a lot of money." She later went to visit defendant at a motel in Wind Gap, Pennsylvania, and saw defendant and O'Grady drinking and getting tattoos.

On August 24, 2006, Pennsylvania State Troopers were asked by members of the Phillipsburg Police Department to assist in locating defendant. They went to a motel in Wind Gap, showed a photograph of defendant to a maid, and were told that he was staying in Room 136. They approached the room, observed the door was open and the room was vacant, and determined the occupant had just exited and fled into a nearby wooded area. Using a police dog, an officer tracked a scent from the room to an area in the woods where

defendant was found hiding. Defendant was handcuffed and removed from the scene. A sock with $2400 in cash was located nearby.

Within an hour of defendant's apprehension, a motor vehicle with O'Grady in the front passenger seat entered the motel parking lot. O'Grady was found to be in possession of $1712 in cash and a small amount of cocaine, and was arrested.

The driver of the vehicle was also found to be in possession of a small quantity of drugs and was taken into custody. The driver testified at trial that he first met defendant and O'Grady at the motel, and he gave them tattoos for $600. Just prior to his arrest at the motel, the driver took O'Grady to a dirt road in Bangor, Pennsylvania, where O'Grady went into the woods to look for a handgun and where there was a safe, paper, and coins.

The driver took the police to the area where the police recovered Counterman's safe, which had been pried open, and his coin wrappers, receipts, tin cannisters, nine[-]millimeter handgun, and ammunition. During a search of Room 136 at the motel, police recovered additional items that had been in Counterman's safe.

While in custody, defendant was administered his <u>Miranda</u>[2] warnings and responded to the officers' questions. A recording of defendant's statements was played during the trial. Defendant said that on August 17, 2006, he and O'Grady drank beer and smoked marijuana and that he was "really[,] really[,] really[,] really[,] drunk." After he and O'Grady left a bar at 2:00 a.m. on August 18, 2006, O'Grady mentioned committing a burglary. They targeted Bostian's house because defendant had been told by his estranged wife[,] Frey[,] that there was a safe in the house that contained a lot of money.

Defendant admitted going with O'Grady to Bostian's home but denied entering the house. According to defendant, due to his intoxication he passed out in the backyard and sometime later O'Grady woke him up and had a safe. Defendant said that O'Grady told him that he had gone into the house and "did what he had to do." Defendant said he attempted to lift the safe but was unable to do so because he had an injured arm and was intoxicated.

Defendant told the officers that O'Grady left the scene, returned with O'Grady's son's car, and he helped O'Grady put the safe in the

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

car. He said he then fell asleep in the car and awoke when they were in the woods, where he and O'Grady put the safe.

Defendant admitted that the $2400 found in the sock in the woods was money taken from Counterman's safe. Defendant stated that he was unaware that Bostian had been killed until he saw the news report the following morning. Defendant acknowledged helping O'Grady pry open the safe, and explained that he had been staying at the motel since August 19, 2006, because he did not want to be questioned regarding Bostian's death.

*Frey, 2016 WL 1589932, at 1—3.*

The Appellate Division affirmed the trial court's rulings on multiple grounds raised by the defendant following his conviction for murder and related offenses. *See Frey, 2016 WL 1589932, at 13.* On September 7, 2016, the New Jersey Supreme Court denied certification. *State v. Frey*, 227 N.J. 252 (N.J., 2016).

On September 27, 2017, Petitioner filed a petition for post-conviction relief ("PCR") in which he contends: his trial counsel was ineffective for failure to investigate, obtain and present exculpatory evidence at trial; the PCR court erred by failing to conduct an evidentiary hearing and denying his motion for a new trial based upon the discovery of new evidence; and finally, that he is entitled to PCR relief because the State improperly withheld the production of *Brady*[3] material. (PCR Pet., ECF 12-24.)   On May 20, 2020, the petition was denied.  (PCR Ct.'s Op. Den. PCR Pet., ECF 13-17 at 21—26.)  On July 30, 2020, Petitioner filed a notice of appeal.  (Pet'r's Direct Appeal Br., ECF 13-18 at 8.)

The Appellate Division Opinion explains that while investigating Petitioner for the August 2006 murder of Ms. Bostian in New Jersey, police also linked him to a July 2006 convenience

---

[3] *Brady v. Maryland,* 373 U.S. 83 (1963) ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.")

store burglary in Bangor, Pennsylvania. *See State v. Frey, 2021 WL 5365878* (N.J. Super. A.D., 2021), at 2. In that case, officers found fresh muddy footprints and pursued two men fleeing a convenience store, then, a K-9 unit led them to an apartment where Petitioner, sweating and evasive, was found with three other men. (*See id.*) Petitioner consented to a search, and police recovered muddy shoes and a sweatshirt matching witness descriptions. (*See id.*) Petitioner and the three men found in his apartment were brought to the Bangor Police Department for fingerprinting, and related evidence was logged after return to the scene of the burglary. (\**See id. at 3*.) In August 2006, the Bangor Police Department issued a warrant for Petitioner's arrest in relation to the convenience store burglary. (*See id.*)

Days later, a Warren County Prosecutor's Officer requested assistance from a Pennsylvania State Trooper in locating Petitioner and O'Grady, who were persons of interest in Ms. Bostonian's homicide. (*See id.*) Later, after being read his *Miranda*[4] rights, Petitioner gave both unrecorded and recorded statements implicating himself in in the New Jersey burglary and homicide of Ms. Bostonian, claiming he was present at the scene of the crime, but not inside the home, as he was too intoxicated to enter. (\**See id. at 3-4*.)

Several witnesses contradicted Petitioner's account, testifying that he did not appear significantly impaired that night. (\**See id. at 4*.) Regarding the Thor's hammer medallion found at the crime scene, Petitioner claimed he had given a similar medallion to his counsel years earlier, and he alleged ineffective assistance for failing to introduce it at trial. (\**See id. at 7*.) Petitioner also argued the Pennsylvania burglary warrant was a pretext to arrest him for the New Jersey burglary and homicide, and sought suppression of his statements, particularly after the Pennsylvania charges were dismissed in 2011 due to lost evidence. (\**See id. at 6*.) The trial court

---

[4] *Miranda*, 384 U.S. 436, (1966).

denied Petitioner's suppression motion and later his post-conviction relief (PCR) petition, finding the arrest was based on a valid warrant with probable cause and that Petitioner's conviction did not hinge on whether he was inside the victim's home.  (*See id. at 6-7.)  The appellate court previously affirmed the denial of the suppression motion, and the PCR court rejected claims of newly discovered evidence and ineffective assistance.  (*See id. at 7.)

On January 20, 2021, Petitioner appealed the decision of the PCR court.  (Pet'r's Direct Appeal Br., ECF 13-18 at 2—26.)  Petitioner argued that his trial counsel was ineffective for failing to introduce a Thor's hammer medallion he allegedly wore at the time of his arrest, which he claimed would have disproved the State's assertion that a similar medallion recovered from the crime scene belonged to him.  *See Frey, 2021 WL 5365878, at 7 (N.J.Super.A.D., 2021).  The court accepted, for PCR purposes, that Petitioner possessed and gave the medallion to his counsel in 2006 or 2007 but concluded that the failure to introduce it at trial did not satisfy either prong of the *Strickland* standard.  (*See id. at 9—10.)  First, the court found no deficiency in counsel's performance, emphasizing the reasonable and strategic decision to rely on defendant's detailed post-arrest statement to police—one that potentially minimized exposure to the more serious charges of burglary, robbery, and felony murder—without placing defendant on the stand.  (*See id. at 10—11.)  Introduction of the medallion would have directly contradicted that statement and undermined the chosen strategy.  (*See id.*)  Second, the court concluded there was no prejudice, as overwhelming evidence independent of the medallion – including eyewitness accounts, physical evidence, and Petitioner's own admissions – overwhelmingly established his involvement in the crimes. (*See id. at 10.)

Petitioner also argued that his counsel was ineffective for failing to obtain a 2011 letter from a Pennsylvania police officer, which noted the officer could not locate evidence supporting

the 2006 Pennsylvania burglary charge that led to Petitioner's custodial statement to New Jersey police. (*See id. at 12-13*.) The court determined this letter did not support suppression of the statement because it bore no relation to the original probable cause determination and merely reflected the absence of evidence years later. (*See id. at 13—14*.) Accordingly, Petitioner could not demonstrate prejudice under *Strickland*. (*See id*. *at 14*.)

Additionally, Petitioner contended that the 2011 letter constituted newly discovered evidence warranting a new trial and that the State committed a *Brady* violation by failing to produce it. (*See id. at 14*.) The court rejected both arguments. (*See id. at 14—15*.) It found that the letter was not material to the defense, did not cast doubt on the validity of the arrest warrant, and that there was no competent evidence the State ever possessed the letter. (*See id. at 14*.) Thus, Petitioner failed to show that the letter was suppressed, favorable, or material as required under *Brady*. (*See id. at 14-15*.)

Finally, the court rejected defendant's claim that an evidentiary hearing was required. (*See id. at 15*.) Because defendant failed to establish a prima facie showing of ineffective assistance of counsel or due process violations, no hearing was warranted under Rule 3:22-10(a). (*See id.*) On November 18, 2021, the judgment denying defendant's PCR petition was affirmed in full. (*See id*.)

On February 11, 2022, the New Jersey Supreme Court denied certification. *State v. Frey*, 250 N.J. 104 (N.J., 2022). Petitioner then filed a habeas petition with this Court, executed on July 13, 2022, in which he raises six grounds for relief: (1) that the trial judge erred by denying the motion to suppress his statement; (2) that the trial court erred by denying the motion to redact the state's photograph of him, as prejudicial; (3) that trial counsel allegedly provided ineffective assistance when he failed to challenge the state's only physical evidence and present exculpatory

evidence effectively; (4) that trial counsel was ineffective for failing to move to suppress evidence; (5) that the trial court erred in denying his motion for a mistrial following a discovery violation; and (6) that the prosecutor committed misconduct by stating improper, inflammatory, and prejudicial comments during summation. (Habeas Pet., ECF No. 3 at 27-37.)

Respondents filed a Response to the Petition in which they argue that the petition should be dismissed because Petitioner's claims for habeas relief are without merit and fail to meet the high threshold required under 28 U.S.C. § 2254. (*See* Resp'ts' Resp., ECF No. 34.)  Accordingly, the parties have fully briefed the issues, which are now presented for adjudication.

## II.    <u>LEGAL STANDARD</u>

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Price v. Vincent*, 538 U.S. 634, 641 (2003).  District courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must " 'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)). To the extent that a petitioner's constitutional claims are unexhausted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

III.    **DISCUSSION**

**A.  Fourth Amendment Claim (Ground One)**

Petitioner first contends that his statements to law enforcement should have been suppressed because they were made while he was in pain from a police dog bite sustained during his arrest.  (*See* Habeas Pet., ECF No. 3 at 27.)  Here, the record establishes that petitioner filed a pretrial suppression motion, which was thoroughly considered and denied by the trial court, and subsequently affirmed by the Appellate Division in 2011.  *\*See Frey, A-1716-09 (N.J. Super. A.D., 2011) at 11*.  The Appellate Opinion explains:

> In his argument challenging this ruling, defendant posits the principle that, where the voluntariness of a statement is in issue, the burden is on the State to prove voluntariness beyond a reasonable doubt, considering the totality of the circumstances, including the declarant's characteristics and the nature of the interrogation. *See State v. Timmendeguas*, 161 N.J. 515, 613-14, 737 A.2d 55 (1999), *cert. denied*, 534 U.S. 858, 122 S. Ct. 136, 15 1 L. Ed. 2d 89 (2001). The State concedes that a statement is involuntary when it is produced by physical violence, the threat of physical violence, or deprivation of food and sleep.
>
> Defendant argues that "[w]hile the police in [defendant's] case did not beat or physically injure him," allowing "him to suffer from serious [dog] bites for several hours without allowing him to be treated or for his pain to be medicated… was the functional equivalent of causing physical injury and should result in a finding of involuntariness." The State responds that defendant was not "subjected to the equivalent of physical violence by depriving him of proper medical care[,] as his dog bites were thoroughly examined and cared for at the scene of the arrest." The State contends, as well, that even though defendant, during the course of the recorded interrogation, "made occasional reference to being in discomfort from the bites, he never exhibited any signs of physical distress and he never requested additional medical treatment."
>
> Having evaluated the record in the light of the arguments advanced by the parties and pertinent principles of law, we discern the trial court's findings to be supported by substantial credible evidence in the record, and we regard its conclusion to follow logically and reasonably from the findings. Those findings and conclusion

> warrant our deference, therefore. *See State v. Johnson*, 42 N.J. 146,
> 162, 199 A.2d 809 (1964); *State v. Watson*, 261 N.J. Super. 169,
> 176, 177, 618 A.2d 367 (App. Div. 1992), *certif. denied*, 133 N.J.
> 441 627 A.2d 1145 (1993); *State v. Boone*, 114 N.J. Super. 521, 525,
> 277 A.2d 414 (App. Div.), *certif. denied sub nom.*, *State v. Terry*, 58
> N.J. 595, 279 A.2d 680 (1971). Moreover, we are in substantial
> agreement with the trial court's analysis. Suppression of defendant's
> statement was not warranted in the circumstances.

(\**Id. at 13-15.*)

The Appellate Division's conclusion that his statements were voluntary under the totality of the circumstances was consistent with Supreme Court precedent, including *Colorado v. Connelly*, 479 U.S. 157 (1986), which requires a showing of coercive police conduct to establish involuntariness, and *Moran v. Burbine*, 475 U.S. 412 (1986) (finding that once it is determined that a criminal suspect's decision not to rely on his *Miranda* rights was uncoerced, that he knew he "could stand mute and request a lawyer," and that he remained "aware of the State's intention to use his statements to secure a conviction," the waiver is valid as matter of law.)

Accordingly, Petitioner fails to demonstrate that the state court's ruling was contrary to, or an unreasonable application of, clearly established federal law, or that the state court decisions were based on an unreasonable determination of facts. *See* 28 U.S.C. § 2254(d)(1)-(2). Therefore, habeas relief is unwarranted on this ground.

### B.  Failure to Redact Photograph Showing Alleged Swastika Tattoo (Ground Two)

Petitioner next argues that the trial court erred by declining to redact a tattoo visible in a photograph introduced into evidence, which he alleges resembled a swastika and was unduly prejudicial. (*See* Habeas Pet., ECF No. 3 at 28.) The trial court reviewed the image, rejected the characterization of the tattoo as a swastika, and admitted the photograph to show Petitioner wearing the Thor's hammer medallion found at the crime scene. (\**See Frey, 2016 WL 1589932,*

*at 7.*)  The Appellate Division affirmed, noting the photograph's probative value and the lack of unfair prejudice:

> We have reviewed the photograph and find no basis to reverse the court's decision to admit it into evidence without the requested redaction. "[T]he admission of the photographs having some probative value, even where cumulative and somewhat inflammatory, rests with the discretion of the trial judge, 'whose ruling will not be overturned save for abuse, as where logical relevance will unquestionably be overwhelmed by the inherently prejudicial nature of the particular picture.'" *State v. Conklin*, 54 *N.J.* 540, 545 (1969) (quoting *State v. Smith*, 32 *N.J.* 501, 525 (1960), *cert. denied*, 364 *U.S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961)).
>
> The photograph was highly probative because it showed defendant, three weeks before Bostian's murder, wearing the medallion found in Bostian's living room. We have reviewed the photograph and are convinced that the court's finding that the challenged tattoo did not resemble a swastika and "look[ed] more like some mechanical bug" is supported by the evidence. As a result, admission of the photograph did not prejudice defendant and the trial court did not abuse its discretion by denying defendant's redaction motion.

*\*Frey, 2016 WL 1589932, at 7-8 (N.J. Super. A.D., 2016).*

On federal habeas review, this Court may only intervene where an evidentiary ruling was so egregious that it rendered the trial fundamentally unfair in violation of due process.  *See Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  This Court finds the state courts' rulings were not unreasonable, particularly given the overwhelming evidence linking Petitioner to the crimes.  As such, habeas relief is denied on Ground Two.

### C.  Ineffective Assistance of Counsel for Failing to Introduce Thor's Hammer Medallion (Ground Three)

Petitioner's third claim asserts that trial counsel was ineffective in failing to introduce a Thor's hammer medallion that he allegedly wore at the time of his arrest, which he contends would have rebutted the State's argument that the medallion recovered from the crime scene belonged to

him.  (*See* Habeas Pet., ECF No. 3 at 29.)   On post-conviction review, the Appellate Division

accepted Petitioner's claim regarding the medallion, but nonetheless concluded that counsel's

performance was neither deficient nor prejudicial under *Strickland*.  *See Frey, 2021 WL 5365878,

at 9—10 (N.J.Super.A.D., 2021)*.   The Third Circuit has reiterated that "[t]here is a strong

presumption" that counsel's conduct falls within the wide range of reasonable professional

assistance. *Rompilla v. Horn*, 355 F.3d 233, 247 (3d Cir. 2004), *rev'd on other grounds*, 545 U.S.

374 (2005). "Perfection is not required." *See id.* at 235.  Further, mere disagreement with counsel's

strategic decisions does not support a claim of ineffective assistance. *Werts v. Vaughn*, 228 F.3d

178, 190 (3d Cir. 2000).

Here, the court reasoned that counsel made a strategic decision to rely on Petitioner's post-

arrest statement to police, which acknowledged limited involvement in the burglary while denying

entry into the victim's home.  *See Frey, 2021 WL 5365878, at 9—10 (N.J.Super.A.D., 2021)*. The

Appellate Division Opinion states:

> The trial record makes it clear that, confronted with the substantial
> evidence against defendant, counsel employed a strategy of
> attempting to limit defendant's exposure to convictions [ ] for theft
> offenses only and minimizing defendant's risk of conviction for
> more serious offenses of burglary and robbery which, due to Ms.
> Bostian's death, also exposed defendant to a conviction for felony
> murder. See N.J.S.A. 2C:11-3(a)(3). As the record makes plain, the
> vehicle for that strategy was defendant's detailed statement to
> Lieutenant Spiers in which defendant offered a version of events
> which, if accepted by the jury, provided at least an arguable basis
> for the jury to convict defendant of theft offenses only, but not
> burglary, robbery, and felony murder.
>
> Trial counsel relied on defendant's statement to convey defendant's
> version of the events as a means of presenting a defense to the most
> serious charges without exposing defendant to the rigors of cross
> examination and challenges to his credibility based on his prior
> criminal convictions. And, consistent with that strategy, trial
> counsel argued to the jury that "every word of" defendant's
> statement to Lieutenant Spiers was true; the statement should be

14

> accepted; and the statement did not permit convictions for the most
> serious crimes, including burglary, robbery, and felony murder. See
> Frey I, slip op. at 18-19 (explaining jury instructions concerning
> theft charges were "clearly indicated" by defendant's statement to
> Speirs, and noting that if defendant had been successful in
> suppressing his statement, the record would have lacked evidence
> supporting a jury charge on the lesser-included theft offenses).
> Defendant did not argue before the PCR court, and does not argue
> on appeal, that his counsel's trial strategy in relying on his statement
> to Lieutenant Speirs fell "outside the wide range of professionally
> competent assistance" required of constitutionally effective counsel,
> or "fell below an objective standard of reasonableness." See
> Strickland, 466 U.S. at 688-90. And we find no basis in the record
> to conclude it was.

*Frey, 2021 WL 5365878*, at 27—29 (N.J. Super. A.D., 2021). (Footnotes omitted.)

Introducing the medallion could have contradicted this account and undermined the

defense strategy.  (*See id.* at 30.)  Moreover, the evidence against Petitioner—including his own

admissions, the recovery of the stolen safe and contents, witness testimony, and his possession of

cash taken during the burglary—was overwhelming.  (*See id.*)  Accordingly, the state court's

resolution of this claim withstands scrutiny under § 2254(d), and the Court denies Petitioner habeas

relief on this ground.

### D.  Procedural Default and Exhaustion Allegedly Illegal Arrest Based on Pennsylvania Warrant and Failure to Suppress Resulting Evidence (Ground Four)

Petitioner further argues that his arrest in Pennsylvania pursuant to a warrant for an

unrelated burglary was pretextual and unlawful, and that his statements and resulting evidence

should have been suppressed.  (*See* Habeas Pet., ECF No. 3 at 32.)  He relies on a 2011 letter from

Pennsylvania law enforcement indicating that evidence supporting the warrant was no longer

available.  (*See id.*)  The Appellate Division explains:

> The January 20, 2011 letter indicates nothing more than the
> evidence obtained in 2006 could not be located almost five years
> later. That the evidence could not be located five years after

> probable cause for the arrest was found by a Pennsylvania judge
> does not reasonably permit or allow the conclusion upon which
> defendant's PCR claim is based – that the affidavit submitted to
> obtain the 2006 arrest warrant was either false or did not support the
> Pennsylvania court's probable cause determination. Defendant
> makes no showing to the contrary.

*Frey, 2021 WL 5365878, at 36. (N.J. Super. A.D., 2021).*

As such, the state courts found that the warrant was valid at the time of arrest and supported

by probable cause:

> [D]efendant argued the Pennsylvania court's January 25, 2011 order
> dismissing the burglary charge established that his 2006
> Pennsylvania arrest was based on an improperly obtained arrest
> warrant. He argued that because he was arrested in Pennsylvania on
> an invalid warrant, his statement to Lieutenant Spiers was obtained
> unconstitutionally and should be suppressed. See generally, State v.
> Chippero, 164 N.J. 342, 353 (2000) (explaining a statement
> "obtained through custodial interrogation should" generally be
> suppressed if it is the result of an unlawful arrest and it is not
> "sufficiently attenuated" from the unlawful actions of the police.)
> As noted, the motion court rejected the argument and denied the
> suppression motion. We affirmed the defendant's conviction
> following his retrial, as well as the court's order denying defendant's
> suppression motion. Frey II, slip op. at 21-22. We determined
> defendant failed to present any evidence demonstrating the 2006
> Pennsylvania arrest was obtained without a proper finding of
> probably cause. Id. at 23.

*Frey, 2021 WL 5365878, at 33. (N.J. Super. A.D., 2021).*

Under *Stone v. Powell*, 428 U.S. 465 (1976), a Fourth Amendment claim is barred from

federal habeas review where the petitioner had a full and fair opportunity to litigate the issue in

state court.  Petitioner extensively challenged the warrant's validity and sought suppression in both

trials and on post-conviction review.  Moreover, the 2011 letter did not retroactively invalidate the

warrant or undermine the probable cause determination, nor was it material under *Brady*, 373 U.S.

83 (1963), as the state court reasonably concluded that the letter was not suppressed by the

prosecution, not favorable to the defense, and not likely to affect the outcome of trial.  The state

court's rejection of this claim was neither contrary to nor an unreasonable application of federal law.  Therefore, habeas relief is unwarranted.

### E. Denial of Mistrial Motion Following Discovery Violation and Testimony Regarding Incarceration (Ground Five)

In Ground Five, Petitioner challenges the denial of his mistrial motion, asserting that a discovery violation led to testimony disclosing his incarceration.  (*See* Habeas Pet., ECF No. 3 at 35.)  In addressing defendant's contention that the trial court erred in denying his motion for a mistrial based on a purported discovery violation, the state's Appellate Division found no abuse of discretion.  *See Frey, 2016 WL 1589932 (N.J. Super. A.D., 2016).*  Defendant argued that the State's failure to disclose jail records referencing correspondence he sent to defense witness Rachel Glester in January 2012 led to prejudicial testimony about his incarceration.  (*\*See id. at 4.*)  On cross-examination, Glester acknowledged receiving a letter from defendant and made an unsolicited remark indicating that they had reconnected during her own period of incarceration, further stating that they had been in contact since then: "When he first got incarcerated, we haven't, we never really stayed in contact, and since my incarceration, we've been, I guess you could say reunited. So we stayed in contact fairly since then, but no." (*See id.*)  The prosecutor then asked Glester if the defendant sent her a letter in January 2012, and she said that he did.  (*See id.*)  The trial court denied the mistrial motion, finding that the State's failure to provide the correspondence did not materially prejudice the defense and that Glester's passing reference to defendant's incarceration did not warrant the drastic remedy of a mistrial.  (*See id.*)  The trial court noted that Glester's statement did not specify the timing or duration of defendant's incarceration and that it was already apparent to the jury from other evidence that defendant had been arrested in connection with the charges.  (*See id.*)  Further, the court issued a curative instruction directing the

jury to disregard Glester's testimony regarding her communications with defendant.  (*See id. at 5.)

On appeal, the Appellate Division deferred to the trial court's discretion, emphasizing that mistrials are warranted only to prevent an "obvious failure of justice" and that lesser remedies— such as curative instructions—are favored where appropriate.  (See id.)  The appellate court concluded that the prosecutor's failure to disclose the letter was improper but not prejudicial and that Glester's reference to defendant's incarceration was not deliberately elicited nor capable of producing an unjust result.  (*See id. at 5-6.)  Thus, the denial of the motion for a mistrial was affirmed as a sound exercise of judicial discretion.  (*See id. at 6.)

Federal habeas courts must presume that juries follow curative instructions, and the Supreme Court has consistently held that a mistrial is warranted only where the error so infects the trial with unfairness as to render the resulting conviction a denial of due process. See Donnelly v. DeChristoforo, 416 U.S. 637, 642-645 (1974). The state court's denial of a mistrial under these circumstances was not objectively unreasonable, and Petitioner is not entitled to habeas relief on this claim.

### F.  Prosecutorial Misconduct During Summation (Ground Six)

Finally, Petitioner contends that improper prosecutorial comments during summation denied him a fair trial.  (See Habeas Pet., ECF No. 3 at 37.) More specifically, Petitioner argues the prosecutor's comment that "defendant celebrated Bostian's death by getting a tattoo," was improper, prejudicial, and requires reversal of his conviction.  *See Frey, 2016 WL 1589932 at 6 (N.J. Super. A.D., 2016).  The trial court found the remarks grounded in evidence and not inflammatory, and the Appellate Division affirmed:

> We are not convinced that the prosecutor's statement that defendant celebrated Bostian's death was clearly and unmistakenly improper.

18

Prosecutors are permitted to "respond to an issue or argument raised by defense counsel." *State v. Johnson,* 287 *N .J.Super.* 247, 266 (App.Div.), *certif. denied,* 144 *N.J.* 587 (1996). Here, the prosecutor's statement was supported by the evidence and was made expressly in response to defense counsel's arguments that defendant knew nothing about what occurred in Bostian's house; defendant first learned of Bostian's murder from a news report; and defendant went to the motel to wait for an investigation to reveal he was not involved.

The prosecutor was entitled to argue that defendant's actions with O'Grady were inconsistent with defense counsel's assertions regarding defendant's innocence. We reject defendant's reliance upon *State v. Blakney,* 189 *N.J.* 88 (1996), in support of his contention that the prosecutor's statement triggered an irrelevant "emotional flashpoint" in the minds of the jury that had the capacity "to anger" the jury against him. In *Blakney,* the Court determined that the prosecutor's expression of personal outrage at injuries inflicted by the defendant "crossed the bounds of propriety" because the "prosecutor's personal feelings of outrage and revulsion were not relevant to the consideration of any issue in the case and were unnecessarily inflammatory." *Id.* at 95.

Here, the prosecutor did not express any personal outrage, his comments were supported by reasonable inferences from the evidence, and his statements were made in direct response to defense counsel's arguments to the jury. The prosecutor's comments were appropriate and were not capable of producing an unjust result.

*Frey, 2016 WL 1589932 at 6—7 (N.J. Super. A.D., 2016).*

In evaluating claims of prosecutorial misconduct, the relevant question is whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The record supports the state court's conclusion that the summation fell within permissible bounds of advocacy, and thus no federal constitutional violation occurred. Therefore, Petitioner's claim for habeas relief on Ground Six fails.

IV.    **CERTIFICATE OF APPEALABILITY**

Under 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because jurists of reason would not disagree with this Court's conclusion that Petitioner has failed to make a substantial showing of the denial of a constitutional right, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further. As such, a certificate of appealability is denied.

V.    **CONCLUSION**

For the reasons stated above, Petitioner's Amended Petition for habeas relief is **DENIED** and Petitioner is **DENIED** a certificate of appealability.

An appropriate order follows.


Dated: August 8, 2025


s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**